**Henry ALLEN, et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, A Municipal Corporation, City Council of Chicago, Richard M. Daley, Individually and as Mayor of the City of Chicago, Glenn E. Carr, Individually and as Commissioner, Department of Personnel, Defendants.**

No. 92 C 4122.

United States District Court,
N.D. Illinois, E.D.

July 2, 1993.

Nathaniel R. Howse, Howse & Howse, R. Eugene Pincham, Philander Scott Neville, Jr., Chicago, IL, for plaintiffs.

Kelly Raymond Welsh, [COR] Susan R. Lichtenstein, Anita K. Modak–Truran, Barbara Susan Smith, Terence J. Moran, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for defendants.

William Franklin Marutzky, Chicago, IL, for Robert Loverde.

Philander Scott Neville, Jr., Chicago, IL, for Willie Reynolds and Reginald Johnson.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs, present and former employees of the City of Chicago, bring this putative class action against the City of Chicago, the Chicago City Counsel, Richard M. Daley (individually and as Mayor of the City of Chicago), and Glenn E. Carr (individually and as Commissioner of the Department of Personnel), alleging: (1) race discrimination in violation of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act, 775 ILCS 5/1–101 *et seq.*; (2) age discrimination in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.*, and the Illinois Human Rights Act, 775 ILCS 5/1–101 *et seq.*; (3) impairment of the right to enforce contracts as guaranteed under the Civil Rights Act of 1866, 42 U.S.C. § 1981; (4) political discrimination in violation of the First Amendment right to free speech and association; and (5) discriminatory distribution of federal funds in violation of 42 U.S.C. § 2000d. Presently before the court are (i) plaintiffs' motion for class certification regarding claims of race discrimination, and (ii) defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth below, the motion for class certification is denied and defendants' motion to dismiss is granted in part and denied in part.

## I. Background

Beginning in May of 1989, the City of Chicago (the "City") initiated a program designed to reorganize its work force. Pursuant to this plan, the City eliminated the Department of Economic Development, the Department of Planning, the Department of Public Works, and the Building Board of Appeals. As of October, 1991, these departments had employed approximately 1,045 city workers. In January of 1992, the City created the Department of Fleet Management (462 employees), the Department of General Services Bureau of Public Engineering (607 employees), the Department of Environment (65 employees), the Department of Planning and Development (88 employees), and the Department of Transportation (340 employees). Additionally, the City entered into contracts with private companies and persons to perform jobs previously fulfilled by city employees. In the process of this restructuring, a large number of employees were laid off, demoted and discharged from city employment. At the same time, the City transferred employees to similar positions in other departments, promoted city employees and hired new workers. In all, the City's reorganization affected approximately 2,834 city employees.

As a group, plaintiffs claim that the City's reorganization had a disproportionate impact on black and hispanic employees, those over forty years of age, and those who were political opponents of Mayor Daley. In support of these allegations, plaintiffs assert: (1) 62% of those employees affected by the reorganization were either black or hispanic; (2) 52% of the city workers hired through the restructure were white, while whites comprise only 37.9% of the City's population; (3) a majority of the black and hispanic employees adversely affected by the reorganization were over 40 years of age, while white employees under the age of 40 were hired; and (4) a number of the employees affected by the restructure were supporters of the late Harold Washington and Eugene Sawyer, political opponents of Mayor Daley.

Of the 62 plaintiffs named in the first-amended complaint, only ten have filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC") and have received notices of right to sue in the United States District Court. These ten individuals seek to act as representatives of the putative class regarding race discrimination, and their individual circumstances can be summarized as follows. Henry Allen, a 59 year old black man, was employed with the Department of Aviation from 1976 to June 30, 1991, at which time he was laid off because of a reduction of staff.

548

Allen claims that he was discriminated against in that it took him 5½ years to receive his first promotion and 4½ years to receive his second, while certain white employees were promoted at a more rapid pace. After Allen was laid off, a number of white employees were promoted within the department. Allen supported the campaigns of both Mayor Washington and Mayor Sawyer.

Julius Body, a 39 year old black man, began his employment with the Department of Aviation on November 2, 1987, as a Security Guard. On January 1, 1992, the City eliminated the position of Security Guard and created the position of Security Officer. Body applied for the position of Security Officer, subjecting himself to a written test, a urine test, and a psychological test. Body was not selected for the position and, on March 6, 1992, along with 39 other Security Guards (38 of which were black), he was laid off. While the City laid off 39 black Security Guards from the Department of Aviation, the City hired, promoted or retained certain white Security Officers. Body supported the campaigns of both Mayor Washington and Mayor Sawyer.

Jane Cole, a 59 year old black woman, began her employment with the Department of Housing on July 11, 1979. Over the years she has held the positions of Planning Intern, Senior Research Assistant, Loan Processing Officer Assistant, Loan Processing Officer and, most recently, Relocation Representative. Cole was laid off from her position as Relocation Representative on December 31, 1991. Cole alleges that race played a role in her termination as certain white employees with less seniority were not laid off. Specifically, she was not afforded an opportunity to move back to her previous position as a Loan Processing Officer, which was occupied by a white person with less seniority at the time Cole was laid off.

Eddie Ellen, a 43 year old black man, was laid off on December 31, 1991, after four years as the Coordinator of Energy Conservation in the Department of General Services. Many of Ellen's white co-employees were automatically transferred from the Department of General Services to the newly formed Department of Environment, which assumed the responsibility for energy management. Despite a gratuitous interview during which Ellen was led to believe that he was going to receive a position with the new department, Ellen was not reemployed. Ellen supported the campaigns of both Mayor Washington and Mayor Sawyer.

Angel Jimenez, a 32 year old hispanic man, began his employment with the Department of Aviation in 1987, as a Security Guard. As previously indicated, on January 1, 1992, the City eliminated the position of Security Guard and created the position of Security Officer. Jimenez applied for the position of Security Officer in August, 1991, and February, 1992. Nonetheless, Jimenez was not selected for the position and, on March 6, 1992, he was laid off. While the City laid off 40 Security Guards (consisting of Jimenez and 39 black men) from the Department of Aviation, the City hired, promoted or retained certain white Security Officers.

John McMullin, a 55 year old black man, began his employment in the Department of Housing as a Relocation Representative in 1968, serving in that capacity for 24 years. He was laid off on November 26, 1991. McMullin alleges that race played a role in his termination as other white employees within the Department of Housing were not laid off despite possessing considerably less experience than McMullin. Although two white employees have resigned from the department since McMullin's lay off, leaving vacant positions, McMullin has not been called back to work. McMullin actively supported the campaign of Mayor Washington.

Janet Moore, a 50 year old black woman, began her employment in the Mayor's Office of Employment Security on September 28, 1981. Since the commencement of her employment she has served as an Eligibility Specialist, an Eligibility Review Specialist, and an Employability Review Specialist I. Moore had applied for the position of Employability Review Specialist II, but the position was given to a white female. Moore was laid off on December 31, 1991. On July 1, 1992, Moore was called back to work as a Clerk II in the Police Department. In this capacity she is currently receiving approximately $10,000 less per year than she had

received while employed as an Employability Review Specialist I. Additionally, Moore claims she is currently being discriminated against on the basis of race as she and other black city employees were not permitted to bid on positions at the Police Department in the new IUU Unit, a unit which is currently comprised of all white employees. According to Moore, these white employees in the IUU Unit perform the same tasks as she and other black employees, but receive a higher wage. Moore supported the campaigns of both Mayor Washington and Mayor Sawyer.

Fredrick O'Neal, a 43 year old black man, was employed as a Principal Systems Engineer in June of 1988, in the Bureau of Telecommunications, Department of General Services. In August of 1991, O'Neal was transferred to the Department of Fleet Management. On January 1, 1991, O'Neal was demoted to the position of Senior Systems Engineer, resulting in an annual salary decrease of $8,400. O'Neal claims that his demotion was related to race as other white employees transferred to Fleet Management were not demoted in job title or salary. O'Neal had applied for the position of Manager of Fleet Management, but was neither interviewed nor considered for the job. The position was eventually filled by a retired white police officer, who did not have an MBA degree as did O'Neal. O'Neal claims that he is treated differently than white professional city employees in that: (1) despite his MBA degree, he receives less pay than many white employees; (2) his telephone does not have access to long distance lines, while his former white subordinates have telephones with access to long distance lines; (3) he does not have an assigned parking space, while his former white subordinates have assigned parking spaces; and (4) he has been forced to move his work area to accommodate other employees, while his former white subordinates have not been required to move their offices or work space. O'Neal further states that Fleet Management has hired or promoted several white employees and that eighteen new service writer positions have been created and filled by relatives and friends of fleet employees. Finally, and particularly troubling, O'Neal alleges that the Department of Fleet Management intentionally engages in discrimination as (i) its Commissioner, William T. Corbett, displays in his office a sign reading "PARKING FOR IRISH ONLY, ALL OTHER WILL BE TOWED AWAY", and (ii) swastikas are displayed throughout the department's office building. O'Neal supported the campaigns of both Mayor Washington and Mayor Sawyer.

Doris Thompson, a 54 year old black woman, commenced her employment in the Mayor's Office of Employment and Training in 1981, holding the positions of Employability Specialist I and Employee Review Specialist. Thompson was laid off on December 31, 1991, rehired, and then laid off a second time on September 16, 1992. She attributes this action to her race in that she and other black employees within her department were treated differently than white employees in other departments comprised of a majority of white persons. Thompson supported the candidacy of Mayor Washington.

Crystal White, a 41 year old black woman, commenced her employment with the City in August, 1976. Since then, she has occupied the following positions: student intern and cashier in the Department of Revenue; staff assistant in the Department of Human Services; and Senior Terminal Operator, Accounting Technician I and Accounting Technician II in the Department of Finance. White participated in the campaigns of both Mayor Washington and Mayor Sawyer, and worked in Mayor Sawyer's Office of Contract Compliance in 1989. In 1989, upon the election of Mayor Daley, White was laid off from her position in the Mayor's Office of Contract Compliance for a period of six months and was not permitted to return to her position as an Accounting Technician II in the Department of Finance. On December 31, 1991, White was laid off from city employment, while white employees with less seniority were not affected by the workplace reorganization.

## II. Class Certification [1]

Henry Allen, Julius Body, Jane Cole, Eddie Ellen, Angel Jimenez, John McMullin,

---

1. Plaintiffs' motion for class certification is ex-

pressly limited to the claims of race discrimina-

Janet Moore, Fredrick O'Neal, Doris Thompson and Crystal White seek to represent a class of persons consisting of "all Black and Hispanic City of Chicago employees who were laid off, discharged, demoted, or were adversely affected (lost wages or lost benefits) as a result of the City's reorganization of its work force that began May 1, 1989 and continues." Plaintiffs' Motion to Certify Class at 2.

Rule 23 of the Federal Rules of Civil Procedure establishes a two-step procedure to determine if a class action is appropriate. The court must first inquire into whether the class meets the four preliminary requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Additionally, a class action that satisfies all four of the Rule 23(a) requirements must also qualify under one of the three subsections of Rule 23(b). In the instant case, plaintiffs seek certification of the class under Rule 23(b)(2), which provides that a class action is proper if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In the alternative, plaintiffs request certification under Rule 23(b)(3), which provides that a class action is proper if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

■ In evaluating the motion for class certification, the allegations made in support of certification are taken as true, and we do not examine the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Spencer v. Central States, Southeast and Southwest Areas Pension Fund*, 778 F.Supp. 985, 989 (N.D.Ill.1991); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D.Ill. 1986). The burden of showing that the requirements for class certification have been met rests with the plaintiffs. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Trotter v. Klincar*, 748 F.2d 1177, 1184 (7th Cir.1984); *Hardin v. Harshbarger*, 814 F.Supp. 703, 706 (N.D.Ill.1993); *Riordan*, 113 F.R.D. at 62.

### A. Numerosity

■ Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. While plaintiffs may not rely on conclusory allegations that joinder is impracticable or on speculation regarding the size of the class, *Valentino v. Howlett*, 528 F.2d 975, 978 (7th Cir.1976); *Kohn v. Mucia*, 776 F.Supp. 348, 352–53 (N.D.Ill.1991), the complaint need not specify the exact number of persons included in the class. *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989); *Retired Chicago Police Ass'n v. City of Chicago*, 141 F.R.D. 477, 484–85 (N.D.Ill.1992); *Patrykus v. Gomilla*, 121 F.R.D. 357, 360 (N.D.Ill.1988). Numerosity analysis does not entail thresholds of "magic numbers"; rather, the requisite finding may be supported by common sense assumptions. *Patrykus*, 121 F.R.D. at 360; *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 785 (N.D.Ill.1984).

■ In order to approximate the size of the putative class, plaintiffs rely on a "city disc" provided by the City that sets forth all "off actions" between October, 1991 and May, 1992. Based on this information, plaintiffs claim that at least 1,800 employees qualify as class members. Although it appears that the "city disc" lists personnel actions beyond the scope of the putative class, including deaths,

---

tion in Count I of their first-amended complaint. As such, it is apparent that plaintiffs will not seek class treatment respecting Counts III, IV or V. Count II purports to be a representative action brought under the ADEA and, hence, is not subject to the requirements of Rule 23 of the Federal Rules of Civil Procedure.

layoffs where employees simply bumped into another position, and seasonal changes, we nevertheless are satisfied the class is so numerous that joinder would be impracticable. To be sure, Exhibit 2 of plaintiff's reply brief indicates that the City in 1991 laid off a total of 527 blacks and 107 hispanics. These numbers alone clearly make joinder impracticable and, as such, the numerosity requirement of Rule 23(a) is satisfied.

### B. Commonality

■ Rule 23(a)(2) requires plaintiffs to demonstrate that there is at least one question of law or fact common to the class. *In re VMS Sec. Litig.*, 136 F.R.D. 466, 473 (N.D.Ill.1991); *Patrykus*, 121 F.R.D. at 361. "Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members." *Riordan*, 113 F.R.D. at 63 (citing *Midwest Community Council, Inc. v. Chicago Park District*, 87 F.R.D. 457 (N.D.Ill.1980)). Thus, class certification cannot be defeated merely because there are some factual variations among the members' grievances. *Id.* (citing *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir.1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981)). Where a common question of law refers to standardized conduct by defendants toward members of the putative class, a common nucleus of operative fact is typically presented, and the commonality requirement is usually met. *Patrykus*, 121 F.R.D. at 361; *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill.1984). In such cases, differences in individual cases regarding treatment or damages does not defeat commonality. *Patrykus*, 121 F.R.D. at 361; *Franklin*, 102 F.R.D. at 950.

■ Allegations of race discrimination significantly complicate traditional class certification analysis, as "racial discrimination is by definition class discrimination." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982). Nonetheless, it is settled law that a person of a given racial group may not represent other members of the group merely because they were all subjected to the same broad type of discrimination by a common employer. In *Falcon*, the Court confronted the following issue: "whether respondent Falcon, who complained that petitioner did not promote him because he is a Mexican–American, was properly permitted to maintain a class action on behalf of Mexican–American applicants for employment whom petitioner did not hire." *Id.* at 149, 102 S.Ct. at 2366. In rejecting the Fifth Circuit's across-the-board rule whereby persons complaining of one employment practice may represent others allegedly aggrieved by a different practice as long as the differing practices were motivated by the same policy, *i.e.*, race discrimination, the Court stated:

> allegation[s] that [racial] discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact.

*Id.* at 157, 102 S.Ct. at 2370. Rather, "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. at 2372. In holding that Falcon could not maintain the proposed class action, the Court distinguished the circumstance where an aggrieved private plaintiff happens to be of the same national origin as other persons allegedly discriminated against by a common employer, from cases where the plaintiff challenges a standardized employment practice:

> If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an em-

ployer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes. In this regard it is noteworthy that Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination.

*Id.* at 159 n. 15, 102 S.Ct. at 2371 n. 15 (emphasis in original).

Likewise, the Seventh Circuit in *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981), rejected the contention that "a class action is appropriate 'in all instances [in which] the discrimination in employment was racial, even though the discrimination may have been manifested in a variety of practices affecting different class members in different ways at different times.'" Patterson alleged that its employer, General Motors, had discriminated against him by replacing him with a white worker of lesser seniority and experience, by failing to promote him, by maintaining essentially an all-white department, and by harassing him in retaliation for the filing of various complaints with state and federal agencies. *Id.* at 478–79. Against this backdrop of conduct directed toward Patterson as an individual, Patterson sought to represent a class of minority persons employed, or might be employed, at designated General Motors plants. *Id.* In finding that Patterson had failed to meet the commonality requirement of Rule 23(a)(2), the Seventh Circuit stated:

> The issue of whether a particular job assignment or promotion denial was discriminatory would depend upon any number of factors peculiar to the individuals competing for the vacancy, including relative seniority, qualifications, availability for work and desire to perform the job. Each disciplinary action would present a different set of facts for each employee. "In other words, the plaintiff's claims do not relate to general policies or practices which are allegedly discriminatory, but rather to individualized claims of discrimination which could not possibly present common questions of law or fact sufficient to justify class action treatment."

*Id.* at 481 (citation omitted).

As framed by plaintiffs in the instant case, an overriding legal issue common to all class members is raised by the first-amended complaint: "did the city layoff and hire City workers on the basis of race [in the reorganization of the City's workforce]?" Reply Memorandum in Support of Class Certification at 7. This broad formulation represents an attempt to characterize the City's conduct as standardized, thus presenting a common nucleus of operative fact. However, contrary to plaintiffs' assertion, the mere fact that each of the challenged employment decisions took place in the context of a workplace reorganization does not in itself provide the unifying force sufficient to meet the commonality requirement. Rather, an examination of the circumstances set forth by the ten advanced class representatives reveals that their claims do not relate to general policies or practices which are allegedly discriminatory. As was the case in *Falcon* and *Patterson,* the facts as detailed in the amended complaint portray individualized claims of discrimination which do not present common questions of fact or law sufficient to justify class action treatment. Indeed, resolution of the merits of the instant dispute will require independent consideration of each plaintiff's qualifications for his or her position, their previous work performance and duties, as well as the qualifications and work history of the white employees allegedly granted preferential treatment. Moreover, each of these considerations must be viewed in light of the employment conditions within each city department, which individually determined which employees would be affected by the reorganization. *See* Amended Complaint ¶ 36, at 24–25 (detailing individual acts of various department heads). In the absence of an alleged discriminatory policy or practice of general application, such as a biased testing procedure, plaintiffs have not satisfied the commonality requirement of Rule 23(a)(2).

## C. Typicality

■ Likewise, plaintiffs have failed to establish that the claims or defenses of the representative parties are typical of the claims or defenses of the class. *See* Fed. R.Civ.P. 23(a)(3). The typicality requirement of Rule 23(a)(3) directs the court "to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983); *see also Patrykus,* 121 F.R.D. at 361–62. While factual differences between the claims do not alone preclude certification, the representative's claim must arise from "the same event or practice or course of conduct that gives rise to the claims of the other class members and ... [be] based on the same legal theory." *De La Fuente,* 713 F.2d at 232; *see also Riordan,* 113 F.R.D. at 63. In other words, the claims, even if based on the same legal theory, must all contain a common "core of allegation." *Riordan,* 113 F.R.D. at 63 (citing *E. v. Lane,* 530 F.Supp. 930, 943 (N.D.Ill. 1981)); *see also Retired Chicago Police Ass'n,* 141 F.R.D. at 485 ("To meet the typicality requirement, the named representatives must establish the bulk of the elements of each class member's claims when they prove their own.").

■ None of the named plaintiffs' claims share a common core of allegation with any of the other named plaintiffs, let alone the class at large. As discussed in the context of the commonality requirement, plaintiffs have not set forth facts alleging that they have suffered as a result of a single employment policy or practice of general application. To be sure, each plaintiff will prevail only upon an individualized showing of racial discrimination. For instance, to the extent that Henry Allen can establish that, as a result of his race, he was not promoted at a satisfactory rate and was eventually laid off, such a showing would not entitle any other plaintiff to the relief requested. The lack of repercussion from claim to claim derives from the diverse nature of the employment actions in controversy (ranging from transfers to lowers paying jobs or less desirable positions, job openings for which a plaintiff was qualified but not selected, job openings for which a plaintiff was not informed, and job loss), the differences in each plaintiff's work history and qualifications, and variations in the qualifications and work history of the white persons allegedly accorded preferential treatment. As each plaintiff's claims are personal and do not arise from "the same event or practice or course of conduct that gives rise to the claims of the other class members," we cannot conclude that they are typical of the claims of the class.

## D. Adequacy of Representation

■ Rule 23(a)(4) requires that the named plaintiffs adequately and fairly represent the interests of the class as a whole. The determination of whether the representative parties will fairly and adequately protect the interests of the class entails a twofold inquiry. First, the court must be satisfied that the named plaintiffs' counsel is qualified to sufficiently pursue the putative class action. Second, the members of the advanced class may not have antagonistic or conflicting interests. *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir. 1986); *Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 90 (7th Cir.1977); *Patrykus,* 121 F.R.D. at 362.

In the instant case, while we have no reason to believe that plaintiffs' counsel will not adequately pursue this matter, the potential of conflicting interests between class members appears too great to allow certification. As defendants poignantly observe, the expansive class definition makes it likely that members of the putative class may have competed with one or more of the representative parties for a single position or promotion. Although the class members and the named plaintiffs allegedly were denied the position or promotion on the basis of race, conflict arises in that multiple class members would request reinstatement to the same position. *See Patterson,* 631 F.2d at 481; *Johnson v. Bond,* 94 F.R.D. 125, 131 (N.D.Ill.1982). More significantly, the personalized nature of plaintiffs' grievances raises a serious question as to whether the representative parties could fairly and adequately protect the interests of the class. As the court in *Bond*

observed, "[s]eparate claims of denial of a promotion can present substantially different facts and plaintiffs' energies may end up being directed toward presenting and defending their individual claims at the expense of the class." *Bond,* 94 F.R.D. at 131. Consequently, we cannot conclude that the named plaintiffs will adequately and fairly represent the interests of the class at large as required by Rule 23(a)(4).

Although curiously neglected by all parties to this action, we observe that the instant plaintiffs are not the first group of former or current city employees seeking to certify a class of minority employees who were allegedly discriminated on the basis of race during the City's reorganization. In *Williams v. City of Chicago,* 1992 U.S.Dist. LEXIS 7650, at *3 (N.D.Ill. May 29, 1992), plaintiffs sought to certify the following class:

—Present and former African–American employees of the City of Chicago, Department of Housing, who were subject to racial discrimination in appointment, transfer, promotion, demotion or termination with respect to their employment;

—Present and former employees of the City of Chicago, Department of Housing, who were subjected to racially discriminatory action or retaliation for opposing racial discrimination;

—All career service employees of the City of Chicago, Department of Housing, who were subject to arbitrary assignment or transfer with respect to their job functions or titles, without notice or hearing in violation of law and the ordinances of the City of Chicago;

—All career service employees of the City of Chicago, Department of Housing, who were subjected to reduction of pay or grade by virtue of the application of invalid Personnel Rule XXVI;

—All career service employees of the City of Chicago, Department of Housing, who were adversely impacted by politically motivated hiring, promotion, transfer or termination in violation of the Shakman Decree to which the City is subject.

Although the class advanced in *Williams* is considerably narrower than the instant putative class, in a Report and Recommendation dated May 29, 1992, Magistrate Judge Elaine Bucklo recommended that plaintiffs' motion for class certification be denied. Significantly, citing *Falcon,* Magistrate Judge Bucklo concluded that, as the complaint stated only that each person had been subjected to "arbitrary, discriminatory behavior," plaintiffs had not met the commonality and typicality requirements of Rule 23(a). Additionally, the Magistrate Judge expressed concern that the diversity of claims may create conflicting interests between class members, rendering the named plaintiffs unable to fairly and adequately represent the class as a whole. United States District Judge Wayne Anderson adopted the Report and Recommendation on March 8, 1993. As detailed above, we find Magistrate Judge Bucklo's analysis in *Williams* compelling and conclude that such reasoning mandates denial of class certification in the present case.

In sum, having failed to satisfy the requirements of Rule 23(a), we deny plaintiffs' motion for class certification respecting claims of race discrimination embodied in Count I of the amended complaint. Our resolution of the motion under Rule 23(a) obviates the need to consider additional arguments pursuant to Rules 23(b)(2) and (3). *See Spencer,* 778 F.Supp. at 991.

### III. Motion to Dismiss

In support of the instant motion to dismiss, defendants maintain that: (1) the Chicago City Council is an improper party-defendant; (2) the allegations of race discrimination in Count I are beyond the scope of those asserted before the EEOC and, thus, not actionable under Title VII; (3) the allegations of age discrimination in Count II are beyond the scope of those asserted before the EEOC and, thus, not actionable under the ADEA; (4) plaintiffs' claims under the Illinois Human Rights Act are precluded due to their failure to exhaust their administrative remedies under that Act; (5) Count III fails to state a claim under 42 U.S.C. § 1981; (6) Count IV fails to state a claim under 42 U.S.C. § 1983 for deprivations of the constitutional right to free speech and free association; (7) plaintiffs lack standing to bring a claim under Title VI, 42 U.S.C. § 2000d, which governs the use of federal funds; and (8) plaintiffs

seek improper relief. We address each contention seriately.

## A. Standard of Review

 A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir.1988); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). We take the "well-pleaded allegations of the complaint as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff." *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellsworth* ).

## B. The Chicago City Council

 Whether the Chicago City Council is amenable to suit in federal court is a question governed by state law. Fed. R.Civ.P. 17(b); *Magnuson v. Cassarella,* 812 F.Supp. 824, 827 (N.D.Ill.1992). To be sued in Illinois, a defendant must have a legal existence, either natural or artificial. *Jackson v. Village of Rosemont,* 180 Ill.App.3d 932, 937–38, 129 Ill.Dec. 670, 673, 536 N.E.2d 720, 723 (1st Dist.1988). Of course, the Chicago City Council lacks a natural existence and, hence, may only be sued under the guise of specific statutory authorization. *Bonilla v. City Council of the City of Chicago,* 809 F.Supp. 590, 600 (N.D.Ill.1992) (Chicago City Council not a legal entity capable of being sued within the context of a redistricting challenge). As the court in *Bonilla* observed, the Chicago City Council is only amenable to suit under the express provisions of the Illinois Freedom of Information Act and the Illinois Open Meetings Act. *Id.* at 601 n. 9. "These express exceptions, which are of relatively narrow scope and impact, merely confirm that without such enactments, direct

suit is unauthorized and improper." *Id.* A review of Illinois law indicates that no case or statutory authority exists to support a direct action against the Chicago City Council in the present context and, as such, the motion to dismiss the Chicago City Council as a defendant is granted.

## C. Race Discrimination (Count I)

As alleged in the amended complaint, only ten plaintiffs have filed charges of racial discrimination with the EEOC and have received right to sue notices. As such, defendants assert that the remaining plaintiffs who have not filed charges with the EEOC and received a right to sue notices may not pursue claims under Title VII. Additionally, defendants maintain that, since none of the ten plaintiffs who filed charges with the EEOC named either Mayor Daley or Commissioner Carr as respondents, these defendants must be dismissed from Count I of the amended complaint.[2]

### 1. Non–Filing Plaintiffs

 In order to successfully maintain a claim under Title VII, each plaintiff must (1) file a charge with the EEOC within the time allotted by statute, and (2) receive a right to sue letter issued by the EEOC. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir.1992); *Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 129 (7th Cir.1989). These administrative filing requirements serve a twofold purpose: (1) to notify the charged party of the alleged violation; and (2) to afford that party an opportunity to participate in conciliation and to comply voluntarily with Title VII. *See Schnellbaecher,* 887 F.2d at 126; *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 905 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982).

---

**2.** Defendants also contend that the ten named plaintiffs who have exhausted their administrative remedies are nonetheless precluded from pursuing claims of class-wide discrimination as each of their claims filed with the EEOC are narrowly tailored to each of the plaintiff's individual circumstances. In light of our ruling that class treatment is inappropriate under Rule 23 of the Federal Rules of Civil Procedure, however, the issue of whether the EEOC investigation reasonably afforded defendants notice of the potential of a class action is moot.

Plaintiffs contend that the court should waive the above filing requirements for those 52 named plaintiffs who neither filed charges with the EEOC nor received a notice of right to sue. Indeed, it is well settled that, under Title VII, "plaintiffs who have not timely filed a charge can rely on the timely charge of another plaintiff in a class action *or* in a multiple plaintiff joint action." *See Anderson v. Montgomery Ward & Co.,* 852 F.2d 1008, 1017–18 (7th Cir.1988) (emphasis in original) (collecting cases). This rule, however, presupposes that the claims of the non-filing plaintiffs arise out of a sufficiently similar discriminatory treatment as those claims brought before the EEOC, thus enabling the employer to receive adequate notice and an opportunity to participate in conciliation. *See Snell v. Suffolk County,* 782 F.2d 1094, 1100 (2d Cir.1986); *Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1011 (11th Cir.1982); *Crawford v. United States Steel Corp.,* 660 F.2d 663, 665 (5th Cir.1981).

In the instant case, assuming that plaintiffs are properly joined in this multiple-plaintiff, non-class action, we hold that the 52 non-filing plaintiffs may not "piggyback" onto the charges of racial discrimination filed with the EEOC. As the parties requesting waiver of the above filing requirements, plaintiffs bear the burden of establishing that the claims of the non-filing plaintiffs arise out of a sufficiently similar discriminatory treatment. Respecting these 52 individuals, the amended complaint states only their age and the department with which they are, or were previously, employed. Significantly, it does not detail the discriminatory conduct to which each individual allegedly was subjected. Rather, to fulfill their burden, plaintiffs rely upon the assertion that the City engaged in class-wide discrimination in the process of its workplace reorganization. These non-filing plaintiffs would have the court believe that they were treated similarly to those plaintiffs who exhausted their administrative remedies merely because they allegedly were subjected to racial discrimination during the period of reorganization. For similar reasons to those specified above within the context of class certification, we reject this contention. Given the personalized nature of

each plaintiff's claim, we do not believe that the EEOC conciliation process would be so "wholly fruitless" as to warrant waiver of the administrative filing requirements. *Cf. Snell,* 782 F.2d at 1101 (concluding that additional filings before the EEOC would be "wholly fruitless" in that all of the claims arose from virtually identical circumstances); *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 498 (5th Cir.1968) ("It would be wasteful, if not in vain, for numerous employees, all with same grievance, to have to process many identical complaints with EEOC. If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume that the next one would be successful."). Consequently, we dismiss all Title VII claims of racial discrimination brought by all plaintiffs who have not filed charges with the EEOC and received notices of right to sue.

### 2. Mayor Daley and Commissioner Carr

Ordinarily, a party not named as a respondent in an EEOC charge may not be sued in a Title VII action. 42 U.S.C. § 2000e–5(f)(1); *Schnellbaecher,* 887 F.2d at 126; *Eggleston,* 657 F.2d at 905; *Le Beau v. Libby–Owens–Ford Co.,* 484 F.2d 798, 799 (7th Cir.1973); *Pommier v. James L. Edelstein Enterprises,* 816 F.Supp. 476, 480 (N.D.Ill.1993). As is the case with the above filing requirements, naming the party as a respondent in an EEOC charge prior to bringing suit under Title VII serves a two-fold purpose: (1) to notify the charged party of the alleged violation; and (2) to afford that party an opportunity to participate in conciliation and to comply voluntarily with Title VII. *See Schnellbaecher,* 887 F.2d at 126; *Eggleston,* 657 F.2d at 905; *Stephenson v. CNA Fin. Corp.,* 775 F.Supp. 238, 239 (N.D.Ill.1991). Nonetheless, it is not a jurisdictional prerequisite. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Perkins v. Silverstein,* 939 F.2d 463, 469–70 (7th Cir. 1991). Rather, the requirement is comparable to a statute of limitations, and is subject to equitable modification. *Perkins,* 939 F.2d at 470. To be sure, courts consistently recognize an exception to the general rule where the unnamed party or parties had adequate

notice of the charge, and had an opportunity to participate in conciliation. *Schnellbaecher,* 887 F.2d at 126; *Eggleston,* 657 F.2d at 905; *see also Feng v. Sandrik,* 636 F.Supp. 77, 81 (N.D.Ill.1986). Additionally, courts consider whether strictly holding a plaintiff to the filing requirement could deprive her of redress of any legitimate grievances. *Eggleston,* 657 F.2d at 907 (citing *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir.1977)); *Stephenson,* 775 F.Supp. at 239; *Feng,* 636 F.Supp. at 81.

Conceding that neither Mayor Daley nor Commissioner Carr was named as a respondent in any of the ten EEOC charges, plaintiffs seek refuge in the *Schnellbaecher* exception, contending "[i]t is axiomatic that Mayor Daley, the Chief Executive Officer of the City of Chicago, and Glenn Carr, the Commissioner of the Department of Personnel, had actual or constructive notice of the plaintiffs' charges that the defendants engaged in racial ... discrimination when the city reorganized the work force." Plaintiffs' Memorandum in Response at 16. Assuming, as we must, that Daley and Carr were aware of a discriminatory impact stemming from the reorganization, this fact standing alone is insufficient to meet the *Schnellbaecher* exception. First, there is no evidence, nor even an allegation, that Mayor Daley or Commissioner Carr possessed knowledge of each individual's charge. Second, even with such knowledge of individual charges, it is clear that neither Daley nor Carr had any notice of any charges against *them. See Schnellbaecher,* 887 F.2d at 127 ("We agree with defendants, however, that the district court properly dismissed the suit against HSSI. Although HSSI had notice of the charges against Baskin [HSSI's subsidiary], it did not thereby have any notice of any charges against *it.*") (emphasis in original). Third, plaintiffs do not claim that either Daley or Carr was given the opportunity to participate in conciliation proceedings aimed at voluntary compliance. Finally, assuming they ultimately prevail in their individual claims of racial discrimination, plaintiffs may still receive the full mea-

sure of available relief against the remaining defendant, the City. Accordingly, we dismiss Mayor Daley and Commissioner Carr as defendants from Count I of plaintiffs' amended complaint.

### D. Age Discrimination (Count II)

██ Count II of plaintiffs' first-amended complaint purports to be a representative action under the ADEA, with plaintiffs Jane Cole and Janet Moore serving as representatives. Fifty-seven named plaintiffs and 68 nonparties, all of which are 40 years of age or older, have "opted into" the representative action.[3] None of the opt-in plaintiffs, and presumably none of those unnamed in the amended complaint yet seeking to opt-in to this action, have filed age discrimination charges with the EEOC. In general, an individual cannot commence an ADEA civil action "until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]," and only if the charge is filed within a certain time period. 29 U.S.C. § 626(d). As with the prerequisites to the successful maintenance of a Title VII claim, a plaintiff is required to file an age discrimination charge with the EEOC so that defendants are adequately appraised of the nature of the charges and are afforded an opportunity to participate in voluntary conciliation proceedings. *Levine v. Bryant,* 700 F.Supp. 949, 954 (N.D.Ill.1988).

Despite the charge requirement, the Seventh Circuit has held that under certain circumstances, a party who has not filed a timely charge of age discrimination with the EEOC may "piggyback" onto the suit of an individual who has filed such a charge. *Anderson v. Montgomery Ward & Co.,* 852 F.2d 1008 (7th Cir.1988). In *Anderson,* 39 former Montgomery Ward managers filed age discrimination charges with the EEOC and then later brought an ADEA suit against the retailer. Montgomery Ward moved for summary judgment against seven of the plaintiffs, alleging that their participation in the suit was barred because they filed their EEOC charges late. The Seventh Circuit

---

**3.** A plaintiff must opt into an ADEA representative suit. This procedure should be contrasted with that for class actions outlined in Rule 23 of the Federal Rules of Civil Procedure. Under Rule 23, a plaintiff belonging to a class must opt out of a class action; otherwise, he or she will be bound by the judgment in the case.

held that the seven plaintiffs were not barred. The court held that an individual need not file an EEOC charge to be able to join a representative suit under the ADEA, as long as the charge that was filed contained an allegation of class-wide discrimination. This notification is necessary so that "the defendant at least be appraised during the conciliation process of the possibility of a subsequent lawsuit with many plaintiffs." *Id.* at 1016. The court noted that at least 23 of the timely charges contained plain allegations of class-based discrimination, and that Montgomery Ward admitted knowing that it faced a class-wide ADEA suit. *Id.* at 1017. "Under these facts, we can only conclude that all the purposes for ADEA's charge-filing requirement have been satisfied." *Id.*

■ Unlike the 23 charges in *Anderson*, the two EEOC charges filed in the instant case, those of Cole and Moore, cannot be read to give notice of a potential class-wide ADEA suit. Cole's EEOC charge states in total:

I. I was employed by the above Respondent [City of Chicago, Department of Housing] on July 11, 1979. My most recent position was Relocation Representative. I was laid off on December 31, 1991 and not given an opportunity to bump a less senior employee.

II. The Respondent offered no reason for not allowing me to bump the less senior employee.

III. I believe that I have been discriminated against because of my race, Black in violation of Title VII of the Civil Rights Act of 1964, as amended and because of my age, 58 (date of birth April 13, 1933) in violation of the Age Discrimination in Employment Act of 1967, as amended, in that I should have been afforded an opportunity to bump into a Loan Officer position which I had previously held which was currently occupied by a less senior Caucasian employee.

Similarly, Moore's EEOC charge reads as follows:

I. I began working for the above-named employer [City of Chicago, Mayor's Office of Employment Security] on September 28, 1981, most recently as an Employability Review Specialist I. On December 31, 1991, I was laid off.

II. Respondent's reason for my layoff was reduction-in-force.

III. I believe that I have been discriminated against because of my race (black) and age 51 (date of birth: January 25, 1941), in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act, in that: Non–Protected Age Group employees with less seniority were retained.

Significantly, neither charge alleges that any other city employee was subjected to age discrimination, let alone a disparate impact or city-wide policy of discrimination. *Cf. Levine,* 700 F.Supp. at 956 (sufficient allegation of class-wide discrimination in EEOC charge: "Since the new management started many employees over 50 years old in managerial positions have been discharges throughout the Country. All have been replaced by younger employees in the age group 20's and 30's."). In that these charges are limited to Cole and Moore's particular allegations of individualized discrimination, the named plaintiffs and unnamed individuals who did not file charges of age discrimination with the EEOC and did not receive right to sue notices, may not "piggyback" onto the age discrimination claims of Cole and Moore. Accordingly, we dismiss all but the individual ADEA claims of Cole and Moore from Count II of plaintiffs' amended complaint.[4]

### E. The Illinois Human Rights Act (Counts I and II)

■ In addition to seeking relief under Title VII and the ADEA, plaintiffs assert that defendants' alleged discriminatory employment practices violated the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1–101 *et seq.* Defendants, in turn, move to dismiss these claims under the IHRA for failure to exhaust administrative remedies under that

---

4. Additionally, for the reasons stated *supra* subsection IV(C)(2) of this opinion, we dismiss from Cole and Moore's individual claims of age discrimination Mayor Daley and Commissioner Carr, neither of whom were named as respondents in the charges filed before the EEOC.

Act. Pursuant to the IHRA, a plaintiff may institute a civil rights action only by filing a charge with the Illinois Department of Human Rights ("IDHR"). *Suarez v. Illinois Valley Community College,* 688 F.Supp. 376, 384 (N.D.Ill.1988). The Act denies an aggrieved party direct access to the courts; instead, upon obtaining a final order from the IDHR, the party may seek judicial review in the state courts. 775 ILCS 5/8–111; *Peters v. Fansteel, Inc.,* 736 F.Supp. 198, 201 (N.D.Ill.1990). Although it is apparent that nine of the named plaintiffs in this case have filed charges with the IDHR, the amended complaint is devoid of an allegation that any plaintiff has obtained a final order from that administrative body. Without such an allegation, plaintiffs' amended complaint fails to state a cause of action under the IHRA and, consequently, we grant defendants' motion to dismiss that portion of Counts I and II which asserts claims under this Act. *See Peters,* 736 F.Supp. at 201; *Perera v. Flexonics, Inc.,* 727 F.Supp. 406, 409 (N.D.Ill.1989); *Muellner v. Mars, Inc.,* 714 F.Supp. 351, 354 (N.D.Ill.1989).

### F. 42 U.S.C. § 1981 (Count III)

■ In Count III of their amended complaint, plaintiffs [5] contend that the City was prohibited under the terms of various collective bargaining agreements ("CBAs") from making employment decisions on the basis of race. As such, plaintiffs allege that the City violated § 1981 by making employment decisions during the reorganization on the basis of race in violation of the CBAs.[6] In support of their motion to dismiss plaintiffs' claims under § 1981, defendants maintain: (1) plaintiffs' claims do not implicate the § 1981 right to make or enforce contracts; (2) plaintiffs

have failed to exhaust their contractual remedies, a prerequisite to bringing a claim under § 1981; (3) plaintiffs' claims against the City and defendants Daley and Carr in their official capacities must be dismissed for failure to allege a custom or policy of discrimination on the basis of race; and (4) plaintiffs' claims against defendants Daley and Carr in their individual capacities must be dismissed for failure to allege that those defendants intentionally discriminated against plaintiffs on the basis of race. As explained below, we reject each of these contentions, save the last regarding plaintiffs' claims against defendants Daley and Carr in their individual capacities.

### 1. The Scope of § 1981

Until the 1989 Supreme Court decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the right to "make and enforce contracts" generally had been interpreted to protect individuals against race discrimination in employment, whether the discrimination occurred at the time the employment contract was made, during the course of the contractual relationship, or at the time the contract was terminated. In *Patterson,* however, the Court held that the right to "make" a contract referred only to contract formation (*i.e.,* hiring and, in certain instances, promotion), and that the right to "enforce" contracts protected nothing more than equal access to legal process in contractual matters. *Id.* at 179–80, 109 S.Ct. at 2374. Under this narrow interpretation, § 1981 does not protect individuals against racial discrimination in the workplace or, for that matter, from termination or any other employment action affecting the terms and conditions of the

---

5. Count III of the amended complaint is explicitly confined to plaintiffs who were union members at the time of the alleged discriminatory conduct. *See* First–Amended Complaint ¶¶ 54–62, at 34–35. The following plaintiffs have been identified as union members: Julius Body, Jane Cole, Angel Jimenez, John McMullin, Janet Moore, Doris Thompson, and Crystal White. For the purposes of this subsection, the term "plaintiffs" refers only to these seven individuals, the only persons identified in the amended complaint as union members.

6. Additionally, plaintiffs contend that defendants violated § 1981 by making employment decisions on the basis of age in violation of the various CBAs. First–Amended Complaint ¶ 60, at 35. It is settled law, however, that § 1981 does not protect employees from adverse actions based upon age. *Kodish v. United Airlines, Inc.,* 628 F.2d 1301, 1303 (10th Cir.1980) (citing *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)); *see also Rush,* 966 F.2d at 1119 ("some showing of differential treatment on the basis of *race* is a necessary element of a claim under [§ 1981]").

employment contract. As a result, *Patterson* dictated that any claim which (1) pertained to conduct arising after the formation of the contract, and (2) did not allege the creation of an impediment to judicial process was to be dismissed for failure to state a claim. *See, e.g., Bush v. Commonwealth Edison Co.,* 732 F.Supp. 895 (N.D.Ill.1990), *aff'd,* 990 F.2d 928 (7th Cir.1993).

Effective November 21, 1991, the Civil Rights Act of 1991 amended § 1981 to restore its scope to pre-*Patterson* days. *Von Zuckerstein v. Argonne Nat'l Lab.,* 984 F.2d 1467, 1472 n. 2 (7th Cir.1993) (construing the 1991 Act to overrule *Patterson.*) Section 1981 now provides that the term "make and enforce" contracts includes:

> the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

42 U.S.C. § 1981(b). Although this amendment does not apply retroactively, *see Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225, 229–30 (7th Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3446 (Dec. 3, 1992),[7] each of the seven Count III plaintiffs set forth allegations of discharge, demotion and failure to promote occurring after November 21, 1991. These allegations certainly fall within the newly restored scope of § 1981 and, given the application of the amendment to this case, we will not dismiss plaintiffs' claims on the basis that they are not premised on an impediment to judicial process or that they involve conduct that took place after the creation of a contract with the City.

### 2. Exhaustion of Contractual Remedies

■ Although plaintiffs' claims fall within the scope of § 1981 as amended by the Civil Rights Act of 1991, defendants assert that they nonetheless must be dismissed because plaintiffs have failed to exhaust their contractual remedies. Specifically, defendants contend that resolution of the instant § 1981 claims will necessitate the interpretation of the various CBAs. As such, defendants maintain that plaintiffs' claims must proceeding in accordance with § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) which, pursuant to the various contractual grievance procedures, requires arbitration of disputes over the interpretation of the CBAs. We disagree. The Seventh Circuit has addressed this very issue in *Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). In *Waters,* plaintiffs contended that its former employer's "last hired, first fired" seniority system violated § 1981, as did two amendatory agreements to the CBA which affected employee recall rights and seniority status. *Id.* at 1312–13. On appeal, the union contended that "plaintiffs should be barred from proceeding against the union under § 1981 because they failed to exhaust their contractual remedies under the collective bargaining agreement." *Id.* at 1316. Observing that the nature of the action "is that of a complaint against racial discrimination in employment and not a labor law action, asserting rights under a collective bargaining agreement," the Seventh Circuit held that § 1981 does not require exhaustion of contractual remedies under the CBA. *Id.* In describing the nature of the action, the *Waters* court noted that "the focus of this civil rights suit is an attack by plaintiffs on the contract itself as embodying racially discriminatory practices." *Id.* In order to distinguish *Waters,* defendants grasp upon this language, contending that, while exhaustion may not be required where § 1981 plaintiffs attack the contract itself, exhaustion is required where such plaintiffs seek to enforce the rights guaranteed under the contract. Defendants' distinction, however, is without substance. First, plaintiffs do not seek to enforce contractual rights via Count III; rather, they endeavor to vindicate alleged civil rights violations. Moreover, the court's determination that exhaustion of remedies is not necessary under § 1981, was derived from principles of law developed under Title

---

7. We observe that the Supreme Court has recently granted certiorari to determine whether the Civil Rights Act of 1991 applies to cases pending when the Act went into effect. *Landgraf v. USI Film Prods.,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993). Additionally, the issue is now before the entire Seventh Circuit. *Mojica v. Gannett Co.,* 986 F.2d 1158 (7th Cir.1993) (rehearing en banc granted before issuance of panel opinion).

VII and 42 U.S.C. § 1983, statutes which provide parallel or overlapping remedies against discrimination. As the court in *Waters* determined, neither Title VII nor any other civil rights act (including § 1983) require exhaustion of remedies under any circumstance. *Id.* Based upon this analysis, it follows that the rule announced in *Waters* cannot be confined to its particular facts, but instead applies to all § 1981 actions. *See also Doe on behalf of Doe v. St. Joseph's Hosp.,* 788 F.2d 411, 426 (7th Cir.1986) ("In ... *Waters* we held that section 1981 did not require exhaustion of remedies."); *Donaldson v. Taylor Prods. Div. of Tecumseh Prods. Co.,* 620 F.2d 155, 158 (7th Cir.1980) ("We agree [with *Waters*] that there is no exhaustion [of remedies] requirement under either [Title VII or § 1981]."). We adhere to the principle set forth in *Waters,* and will not dismiss Count III based upon plaintiffs' failure to exhaust contractual remedies.

### 3. Municipal Liability under § 1981

■ In *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court held that:

the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on [a] claim for damages against [a state municipality, a plaintiff] must show that the violation of his "right to make [and enforce] contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

*Id.* at 735, 109 S.Ct. at 2722; *see also East v. City of Chicago,* 719 F.Supp. 683, 688 (N.D.Ill.1989). Thus, as is the case under § 1983, municipal liability under § 1981 may not rest upon the doctrine of superiors' liability, *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1390 (7th Cir.1984), or the doctrine of respondeat superior. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, government entities, such as the City, cannot

be held liable unless an official policy or custom caused the constitutional violation asserted in the complaint. *Id.; Thompson v. Duke,* 882 F.2d 1180, 1187 (7th Cir.1989), *cert. denied,* 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990). Moreover, a suit against a state official in his official capacity is essentially an action against the state entity by which the officer is employed. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985); *Burmeister v. Stone,* 751 F.Supp. 759, 760 (N.D.Ill.1990), *aff'd,* 958 F.2d 1419 (7th Cir.1992).

The clearest case for municipal liability under § 1981 is the case like *Monell* itself, where an unconstitutional policy statement, ordinance, regulation or decision is formally adopted and promulgated by the governing body itself. *See Monell,* 436 U.S. at 661, 98 S.Ct. at 2020 (Department of Social Services and Board of Education officially adopted a policy requiring pregnant employees to take unpaid maternity leaves before medically necessary).

■ In addition, *Monell* allows the imposition of municipal liability when the challenged conduct reflects "practices of state officials ... so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)). "Custom and usage" by municipal employees and agents may be attributed to a municipality when the duration and frequency of the practices are sufficiently widespread so as to give rise to an inference of actual or constructive knowledge on the part of the municipality. *Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir. 1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *McLin v. City of Chicago,* 742 F.Supp. 994, 998 (N.D.Ill.1990). Thus, a single incident of unconstitutional conduct is insufficient to the requisite municipal policy. *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985).

Finally, municipal liability under § 1981 may arise from the isolated decisions of officials who possess "final policymaking author-

ity" in the area in question. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723; *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). Although noting that the question of whether a particular municipal official possesses "final policymaking authority" is determined by reference to state law, the Court in *Praprotnik* set forth an elaborate definition of "final policymaking authority" for the purposes of municipal liability: "[T]he authority to make municipal policy is necessarily the authority to make *final* policy. [Citation omitted]. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (emphasis in original).

Under the principles set forth in *Monell* and its progeny, we conclude that the seven Count III plaintiffs have sufficiently alleged facts from which we may infer a "custom" of racial discrimination attributable to the City by virtue of its widespread reach. Rather than detailing a single incident of alleged racial discrimination, the amended complaint sets forth conduct directed against ten separate individuals allegedly attributable to race. First–Amended Complaint ¶¶ 2–11, at 3–13. Further, the amended complaint lists 52 additional persons who purportedly were subjected to employment actions based on race. *Id.* ¶ 12, at 14–17. Plaintiffs also allege conduct on the part of various city department heads from which, when taken at face value, we can infer racially discriminatory conduct widespread in both duration and frequency. *Id.* ¶ 36, at 24–25. That many of these alleged incidents occurred within different city departments and at the hands of different city officials—facts which played a substantial role in the denial of class certification—is insignificant in our determination that, when taken together, they establish a custom sufficient to establish the potential of municipal liability. As alleged, the challenged conduct reflects practices of city officials so permanent and well settled as to constitute a "custom" with the force of law. Accordingly, we will not dismiss Count III of plaintiffs'

amended complaint against the City or defendants Daley and Carr in their official capacities.

**4. Individual Liability of Daley and Carr**

To state a claim under § 1981 against defendants Daley and Carr in their individual capacities, plaintiffs shoulder the burden of sufficiently alleging that these defendants possessed an intent to discriminate on the basis of race. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984); *Watson v. Pathway Fin.*, 702 F.Supp. 186, 187 (N.D.Ill.1988). Respecting the intent requirement, the Seventh Circuit has repeatedly cautioned that "conclusory allegations of generalized racial bias do not establish discriminatory intent." *Minority Police Officers Ass'n of South Bend v. City of South Bend*, 801 F.2d 964, 967 (7th Cir.1986).

The amended complaint presently before the court contains no direct allegations of intentional racial discrimination on the part of Defendants Daley and Carr. Rather, plaintiffs contend that Mayor Daley and Commissioner Carr

> were aware of the City's reorganization; approved the plan to reorganize the City's work force and took no steps to prevent Black and Hispanic employees from being laid off, transferred, demoted, or to prevent the Black and Hispanic plaintiffs' jobs from being privatized and given to private white companies or people.

First–Amended Complaint ¶ 29, at 22. True, the failure to take reasonable steps to prevent a barrage of racist acts can render an employer or supervisor liable under § 1981 if that person knew, or in the exercise of reasonable care should have known, about the campaign of racial harassment. *See Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986). Nonetheless, an employer is under no legal duty to purge all racially offensive conduct from the workplace. *Id.* (citing *Howard v. National Cash Register Co.*, 388 F.Supp. 603, 606 (S.D.Ohio 1975) (An employer "is not charged by law with discharging all Archie Bunkers in its employ.")). Not only have plaintiffs failed to allege that defendants Daley and Carr were aware of

any of the individual incidents of alleged discriminatory conduct, but the amended complaint is devoid of the more general allegation that these defendants were aware of the racial impact of the City's reorganization effort. As such, plaintiffs have failed to state a claim pursuant to § 1981 against defendants Daley and Carr in their individual capacities. *See Williams v. City of Chicago*, 1993 U.S.Dist. LEXIS 4137, at \*4 (N.D.Ill. Mar. 31, 1993) (Report and Recommendation of Magistrate Judge Bucklo).

### G. Political Discrimination (Count IV)

The following plaintiffs have alleged that they were subjected to adverse employment actions based on their public support for political opponents of Mayor Daley: Henry Allen, Julius Body, Eddie Ellen, John McMullin, Janet Moore, Fredrick O'Neal, Doris Thompson, and Crystal White. Based on this conduct, in Count IV of their amended complaint, these eight plaintiffs assert (1) claims of political discrimination directly under the First Amendment of the United States Constitution, and (2) claims pursuant to 42 U.S.C. § 1985(3) that defendants conspired to deprive plaintiffs of their First Amendment rights.

■ To the extent that Count IV seeks to assert claims directly under the First Amendment of the United States Constitution, they are dismissed. Section 1983 provides a cause of action against municipalities and municipal employees, and the availability of this statutory remedy precludes direct claims under the Constitution. *Flores v. City of Chicago*, 682 F.Supp. 950, 953 (N.D.Ill.1988); *Bieneman v. City of Chicago*, 662 F.Supp. 1297, 1299–1300 (N.D.Ill.1987). While we would normally construe these claims as brought pursuant to § 1983, plaintiffs have expressly disavowed reliance on this statute:

> The plaintiffs would ask the District Court to examine the plaintiffs' first amended complaint and to note that nowhere in their amended complaint, including Counts I or IV of plaintiffs' first amended complaint, do the plaintiffs cite Section 1983. See First Amended Complaint.... Count IV of the plaintiffs' first amended com-

plaint is predicated on the First Amendment of the United States Constitution and not on Section 1983 as the defendants contend in their memorandum. The plaintiffs maintain that Section 1983 is not cited in their amended complaint, therefore, that they are not bound by the pleading rules which apply to Section 1983 actions. Consequently, since Section 1983 is not relied on by the plaintiffs nor cited in the plaintiffs amended complaint, the District Court should ignore the arguments in the defendants' memorandum predicated on Section 1983.

Plaintiffs' Memorandum in Response to Defendants' Motion to Dismiss at 7. It is evident that plaintiffs' disavowal of § 1983, stems from the belief (right or wrong) that they could not satisfy the pleading requirements associated with an attempt to hold these municipal defendants liable under that statute. And, plaintiffs surely believed that they could circumvent these requirements by invoking the First Amendment directly. That this strategy has proved flawed does not compel that we now afford plaintiffs a shot at § 1983, at least under the amended complaint as drafted. As the Supreme Court has often repeated, " 'the party who brings a suit is master to decide what law he will rely upon.' " *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 22, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913)).

■ In order to state a claim pursuant to § 1985(3), plaintiffs must allege the existence of four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived a right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983); *Wilbert v. City of Chicago*, 768 F.Supp. 253, 255 (N.D.Ill.1991). Defendants

contend that the conspiracy in Count IV must be dismissed as: (i) § 1985(3) does not extend to conspiracies to deprive First Amendment rights; (ii) plaintiffs have failed to allege that the alleged conspirators agreed upon a common scheme or plan; and (iii) the intra-corporate conspiracy doctrine precludes plaintiff's conspiracy claims.

Respecting the scope of substantive rights protected through § 1985(3), the Seventh Circuit has explicitly held that conspiracy claims brought pursuant to this statute do not reach nonracial, political conspiracies. See Grimes v. Smith, 776 F.2d 1359, 1366 (7th Cir.1985); see also Feng v. Sandrik, 636 F.Supp. 77, 84 n. 7 (N.D.Ill.1986) ("[T]he scope of substantive rights protected through § 1985(3) actions does not include those contained in the First Amendment."). Nonetheless, the Grimes court was careful to note that its holding did not disturb "prior decisions in which we held that conspiracies animated by both racial and political motives were within the scope of § 1985(3)." Grimes, 776 F.2d at 1366 n. 12 (emphasis in original). In the present case, the amended complaint clearly alleges a conspiracy motivated by both race and politics and, as such, falls within the scope of § 1985(3). See First–Amended Complaint ¶¶ 66, 71, 75 & 78, at 37–40.

 To sustain a cause of action under § 1985(3), plaintiffs must allege and prove the existence of a conspiracy among "two or more persons." In the instant case, plaintiffs set forth the members of the conspiracy as including "Mayor Daley, Commissioner Carr, the City Council members who approved the annual appropriation ordinance, and executive and managerial persons whose actions and pronouncements are regarded as the policy of the City of Chicago." Id. ¶ 74, at 39. While we believe that plaintiffs have alleged facts indicating that these individuals came to a meeting of the minds concerning unconstitutional conduct, we agree with defendants that the "intra-corporate conspiracy" theory bars this claim. The Seventh Circuit has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees. See Travis v. Gary Community Mental Health Center, Inc., 921 F.2d 108, 110–11 (7th Cir.1990), cert. denied, — U.S. —, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991). Although the doctrine was first developed in the context of antitrust litigation, the court in Travis reiterated that "[i]ntra-corporate dealings under § 1985 ... should receive the same treatment as intra-corporate dealings under [the antitrust laws]." Id. at 110. In the instant case, plaintiffs do not contend that this doctrine does not apply within the context of § 1985. Rather, plaintiffs contend that the participants they have identified comprise at least two separate "persons." Specifically, plaintiffs attempt to separate Mayor Daley and Commissioner Carr as members of the executive branch of local government and the various city aldermen who voted for the annual appropriation ordinance as members of the legislative branch of local government. However, both defendants and the unnamed city aldermen are members of the same municipal corporation, i.e., the City of Chicago.[8] Finding no reason to restrict the intra-corporate dealings doctrine to private entities, see Hull v. Cuyahoga Valley Bd. of Educ., 926 F.2d 505, 509–510 (6th Cir.) (employees and agents of school board are not separate "persons" to form a conspiracy), cert. denied, — U.S. —, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991), we hold that the various participants identified by plaintiffs are not separate "people" capable of conspiring with each other for the purposes of § 1985(3). Accordingly, we dismiss plaintiffs' Count IV conspiracy claims.

## H. Title VI (Count V)

Section 601 of Title VI, 42 U.S.C. § 2000d, provides that "[n]o person ... shall, on the ground of race, color, or natural origin, be excluded from participation in, be denied the benefit of or be subjected to discrimination under any program or activity receiving Federal financial assistance." In Count V of their amended complaint, plaintiffs contend that the City, as a recipient of federal funds, made employment decisions based on race in

---

8. As discussed supra subsection IV(B), the City Council does not have a separate legal existence apart from the City of Chicago for the purposes of this lawsuit.

violation of § 601 of Title VI. Defendants move to dismiss Count V on the ground that plaintiffs lack standing to challenge defendants' use of federal funds.

██ In order to bring a private action under Title VI, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226, 1235 (7th Cir.1980); *see also N.A.A.C.P. v. Wilmington Medical Center, Inc.,* 599 F.2d 1247, 1252 (3d Cir.1979). Plaintiffs do not, and clearly cannot, make such allegations. We observe that the court in *Simpson* has recognized that "[t]his principle is somewhat broadened in that some administrative actions indicate that the antidiscrimination provision of Title VI is applicable also to employment practices of recipients of federal financial assistance in situations where employment discrimination against non-beneficiaries affects the beneficiaries of the assistance." *Id.* at 1235 n. 16. Although plaintiffs do not allege that they are the intended beneficiaries of the federal funds received by the City, they do allege that they "provide aid or assistance to some of the intended beneficiaries, while they were working, which will no longer be received now that they are unemployed." First–Amended Complaint ¶ 85, at 42. This presumptive allegation, however, is insufficient to withstand defendants' motion to dismiss. While defendants need not prove at this early stage of the proceedings the existence of a causal relationship between the City's alleged discriminatory conduct and an affect on the intended beneficiaries, in the absence of some specific allegations concerning which plaintiffs' jobs affected what type of intended beneficiary under which federally funded program, we can only conclude that plaintiffs lack standing to assert a claim under Title VI. Accordingly, we dismiss Count V of plaintiffs' first-amended complaint.

### I. Propriety of the Relief Sought

Defendants request that the court strike plaintiffs' requests for (1) punitive damages under Count IV, (2) an injunction prohibiting the City from receiving federal funds under Count V, and (3) an injunction prohibiting the City from entering into contracts with private companies and individuals under Counts I–III. As we have dismissed Counts IV and V, defendants' objections to the first two of the challenged prayers for relief are moot. Respecting the propriety of an injunction prohibiting the City from "privatizing" city jobs, we find plaintiffs' request overbroad and, thus, we strike it under Fed. R.Civ.P. 12(f).

### IV. Conclusion

For the reasons set forth above, we take the following action: (1) plaintiffs' motion for class certification is denied; (2) the Chicago City Council is dismissed from this action as an improper party-defendant; (3) all Title VII claims of racial discrimination brought by all plaintiffs who have not filed charges with the EEOC and received notices of right to sue are dismissed; (4) Mayor Daley and Commissioner Carr are dismissed as defendants from Counts I and II of plaintiffs' amended complaint; (5) all but the individual ADEA claims of Cole and Moore are dismissed from Count II of plaintiffs' amended complaint; (6) defendants' motion to dismiss that portion of Counts I and II which assert claims under the IHRA is granted; (7) Count III of plaintiffs' amended complaint is dismissed only to the extent that it seeks to hold Mayor Daley and Commissioner Carr liable under § 1981 in their individual capacities; (8) Counts IV and V are dismissed in their entirety; and (9) plaintiffs' request for an injunction prohibiting the City from entering into contracts with private companies and individuals is stricken under Fed.R.Civ.P. 12(f) as overbroad. It is so ordered.