**Gwendolyn ABRAM, et al., Plaintiffs,**

**v.**

**UNITED PARCEL SERVICE OF AMERICA, INC., et. al., Defendants.**

No. 97–C–1233.

United States District Court, E.D. Wisconsin.

May 10, 2001.

Sarah E. Siskund, Charles J. Barnhill, Jr., William P. Dixon, Miner, Barnhill & Galland, Madison, WI, Joseph M. Sellers, Paul T. Gallagher, Christine Webber, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Curry First, First, Blondis, Albrecht, Bangert & Novotnak, Milwaukee, WI, Judson H. Miner, Miner, Barnhill & Galland, Chicago, IL, for plaintiffs.

Mary P. Ninneman, George K. Whyte, Jr., Heidi B. Retzlaff, Quarles & Brady, Milwaukee, WI, Raymond L. Wheeler, Portia R. Moore, Elizabeth P. Allor, James E. Boddy, Jr., Valerie R. Park, William R. Burford, Yolanda M. Sanders, Morrison & Foerster, San Francisco, CA, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

This employment discrimination matter comes before the Court on a motion by the plaintiffs for class certification under Federal Rule of Civil Procedure 23. The ten named plaintiffs are African–Americans employed as full-time supervisors by United Parcel Service of America, Inc. and United Parcel Service, Inc. (collectively, "UPS"). They allege that UPS's system for determining supervisor compensation is "excessively subjective" and thus permits discrimination forbidden by 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). The plaintiffs seek certification of a nationwide class consisting of "all African–American full-time supervisors employed throughout UPS." Because the plaintiffs have failed to establish the prerequisites for class certification under Rule 23(a), their motion is denied.

## BACKGROUND

The plaintiffs assert that UPS has discriminated against them individually—and against African–American full-time supervisors as a class—with respect to *compensation*. Specifically, they claim that UPS "maintains highly subjective, facially neutral performance rating and compensation systems which result in discriminatorily lower ratings and pay for African American supervisors than for their white counterparts." Memorandum in Support of Class Certification ("Class Cert.Mem."), p. 1. As originally stated, the allegations against UPS were much broader. However, after extensive discovery relating to class certification issues, the plaintiffs amended their complaint and withdrew some of their claims, as outlined in a stipulation approved by the Court on April 5, 2000. The facts relevant to the plaintiffs' surviving compensation claim, *i.e.*, facts concerning the structure of UPS and how it determines supervisor compensation, are largely undisputed.[1]

UPS, a nationwide company that provides package delivery service to individual and business clients, employs roughly 300,000 people. Declaration of Lea Soupata ("Soupata Decl."), ¶ 2. The company is divided into eleven regions, which in turn are divided into districts. *Id.*, ¶¶ 3–4. Each district is responsible for delivering packages within a specified geographical area. *Id.*, ¶ 9. There are sixty-five districts in all. *Id.*, ¶ 3. Some extend to an entire state or bloc of states, while others are confined to a major urban area. *Id.*, ¶ 9. Each district is headed by a district manager, whose subordinates, called division managers, are responsible for particular functions within the district. *Id.*, ¶ 11. On the next rung down the managerial ladder, reporting to the division manag-

---

1. On April 26, 1999, the Court authorized discovery by the plaintiffs of statistical data for "all UPS employees nationwide at the level of full-time supervisor and above." This data, as it relates to the plaintiffs' compensation claim, will be discussed as necessary below, along with the conclusions of the parties' experts.

ers, we find center managers. *Id.* Lastly, there are roughly 16,850 full-time supervisors, who report to the center managers. *Id.* Approximately ten percent of these full-time supervisors are African–American, and they comprise the putative class in this case. Class Cert.Mem., p. 10. The ten named plaintiffs (representing seven different districts) are all African–American full-time supervisors employed by UPS. Second Amended Complaint, ¶¶ 33–66.

The parties agree that UPS has standardized the personnel procedures that affect compensation, including the performance appraisal forms used to evaluate full-time supervisors. Although the form has changed three or four times since 1992, at any given time the districts all use the same form. The parties also agree that actual decisionmaking as it relates to compensation is individualized and decentralized. Center managers evaluate the performance of full-time supervisors and their evaluations (which affect salary) are reviewed only as far as the district manager level. *See, e.g.,* Declaration of Myron Gray ("Gray Decl."), ¶¶ 4–5. While the plaintiffs place great emphasis on performance evaluations, claiming that this is where bias creeps into the system, it should be noted that performance evaluations are not the only determinant of a full-time supervisor's pay. Other factors include (1) the individual's pay when he or she was promoted to full-time supervisor, (2) the length of time since that individual was promoted, (3) the geographic location of the UPS facility in which the supervisor works, (4) the type of supervisor position held by the employee, (5) the supervisor's educational background, and (6) his or her salary grade. Opposition to Motion for Class Certification ("Opp.Mem."), p. 7.

Decentralization in personnel matters is a practical necessity in any large business. Likewise, as the defendants' expert observes, "salary setting in most occupations, and virtually all management occupations, includes subjective assessments of performance and the context in which that performance took place." Report of Michael P. Ward, Ph.D ("Ward Rept."), p. 12 n. 12. From the plaintiffs' perspective, however, the standardized

personnel procedures developed by UPS allow for too much discretion and "subjective judgment" on the part of center managers. Such a system, according to the plaintiffs, invites the impermissible consideration of race. The basic idea behind lawsuits alleging "excessively subjective" decisionmaking is that "the employer systematically discriminates against its employees by permitting subordinate managers to make employment decisions ... without providing any objective framework for the exercise of that subjective judgment." Gary M. Kramer, *No Class: Post–1991 Barriers to Rule 23 Certification of Across-the Board Employment Discrimination Cases*, 15 LAB.LAW 415, 417 (Winter/Spring 2000). Such lawsuits can be framed in terms of "disparate treatment," "disparate impact," or, as here, *both* disparate treatment and disparate impact. *Id.* at 420–22; Class Cert. Mem., p. 1.

Statistical data relating to full-time supervisor compensation at UPS from 1992–1998 offers some support for the plaintiffs' disparate impact claim. The data, considered in the *aggregate* (and without any controls for non-racial factors that legitimately affect compensation, such as education), shows a statistically significant gap in compensation between African–American full-time supervisors and their white counterparts. However, as the Court observed when it authorized discovery of the statistical data, the "principal question, for certification purposes, is whether the plaintiffs can make an adequate statistical showing of a *consistent* pattern of [lower pay] within the class of African–American [full-time supervisors], both within their respective districts and nationally." Decision and Order, April 5, 2000, p. 3 (emphasis added). In the absence of a consistent pattern, as discussed below, the closely-intertwined class action prerequisites of "commonality," "typicality," and "adequacy of representation" are not present.

## DISCUSSION

### I. Class Action Standard

This Court enjoys "broad discretion" in determining whether certification of a class-action lawsuit is appropriate. *Keele v. Wexler,* 149 F.3d 589, 596 (7th Cir.1998). *See*

generally *Califano v. Yamasaki,* 442 U.S. 682, 703, 99 S.Ct. 2545, 61 L.Ed.2d 176, (1979) ("[M]ost issues arising under Rule 23 ... [are] committed in the first instance to the discretion of the district court"); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 345, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (district courts have "broad power and discretion ... with respect to matters involving the certification" of class actions). The exercise of that discretion, nevertheless, must conform to the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993).

Rule 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The plaintiffs bear the burden of showing that certification is proper, and failure to meet any one of the four prerequisites under Rule 23(a) precludes certification of the proposed class. *Retired Chicago Police,* 7 F.3d at 596. "[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Stastny v. Southern Bell Tel.,* 628 F.2d 267, 273 (4th Cir.1980) (observing that "the broad remedial purposes of Title VII and the undoubted utility of the class action device for many Title VII actions do not relieve the obligation imposed by ... Rule 23 to inquire into the specific fitness ... of each Title VII case for which class action status is sought."); *West v. Allis–Chalmers Corp.,* 96 F.R.D. 550, 552 (E.D.Wis.1982) ("Each of these elements must be satisfied, even in a Title VII discrimination suit").

If all four prerequisites of Rule 23(a) are satisfied, the Court determines whether to certify the class under one of the three subsections of Rule 23(b). *Allen v. City of Chicago,* 828 F.Supp. 543, 550 (N.D.Ill.1993). In this case, the plaintiffs seek certification under subsection (b)(2) "while treating the class as if under [subsection (b)(3) ] by giving class members notice and an opportunity to opt out [of the class]." Class Cert. Mem., p. 18. The Seventh Circuit has endorsed "hybrid" certification of this kind as one "option" for "handling" class certification in the aftermath of the 1991 amendments to the Civil Rights Act, which permitted Title VII plaintiffs to sue for monetary damages. *Lemon v. Int'l Union of Operating Engineers, Local 139,* 216 F.3d 577 (7th Cir.2000); *Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894 (7th Cir. 1999); *see also* Kramer, *No Class,* 15 LAB. LAW at 475. However, because the proposed class in this case fails to satisfy the Rule 23(a) prerequisites to certification, as discussed below, the Court need not consider the nuances of subsection (b) or the various "options" available in terms of notice and opt-out rights. *Allen,* 828 F.Supp. at 554.

In evaluating a motion for class certification, it is sometimes necessary to "probe behind the pleadings" to determine whether "the interests of absent parties are fairly encompassed within the named [plaintiffs'] claims." *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. Indeed, to protect absent class members *and* defendants, this Court has an affirmative obligation to "resolv[e] factual and legal disputes that strongly influence the wisdom of class treatment." *Szabo v. Bridgeport Machines, Inc.,* No. 01–8003, slip. op. at 4–5, 249 F.3d 672 (7th Cir. May 4, 2001). Thus, instead of assuming that whatever the plaintiffs allege is true, as it would in testing the legal sufficiency of a complaint under Rule 12(b)(6), the Court may "look[ ] beneath the surface of [the] complaint to conduct the inquiries in [Rule 23] and exercise the discretion it confers." *Id.* Here, in addition to the allegations of the Second Amended Complaint, the Court considers the affidavits and expert reports that have been submitted by the parties.

## II. Rule 23(a) Prerequisites

### A. *Numerosity*

■ Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. While plaintiffs "may not rely on conclusory allegations that joinder is impracticable or on speculation regarding the size of the class, the complaint need not specify the exact number of persons included in the class." *Allen,* 828 F.Supp. at 550 (internal citations omitted). There is no "magic number" that will support (or defeat) class certification and "common sense assumptions" may guide the Court's findings with respect to "numerosity." *Id.*

■ UPS employs approximately 1,600 African–American full-time supervisors in any given year. Class Cert. Mem., p. 10. Apparently recognizing that it would be impracticable for each of these employees to bring a separate action, UPS concedes that the "numerosity" requirement has been satisfied. Opp. Mem., p. 20.

### B. *Commonality & Typicality: The Stastny Factors*

"Rule 23(a)(2) requires plaintiffs to demonstrate that there is at least one question of law or fact common to the class." *Allen,* 828 F.Supp. at 551. The typicality requirement of the next subsection "directs the court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Id.* at 553. The parties agree that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" and that "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364. Accordingly, the Court will adopt the convention used in UPS's brief of referring to the commonality and typicality prerequisites collectively as the "commonality criteria."

The plaintiffs argue that the commonality criteria are satisfied because all African–American full-time supervisors at UPS, including the named plaintiffs, were "subjected to UPS's uniform rating and compensation systems and suffered from the resulting under-compensation of African–American supervisors as a group." Class Cert. Mem., p. 14. This argument carried the day in *Morgan v. UPS,* 169 F.R.D. 349 (E.D.Mo.1996), which involved allegations that UPS *managers* were denied promotions and received lower pay than their white counterparts because of their race. The District Court in *Morgan* found that UPS's "alleged institution of discriminatory promotion and salary policies" (including the "policy" of decentralized, subjective decisionmaking) "pervaded" all of the proposed class members' claims and thus provided the requisite commonality and typicality. *Id.* at 356.

UPS urges the Court to look beyond standardized personnel procedures and consider the factors enumerated by the Fourth Circuit in *Stastny* to determine whether there was "an identifiable pattern or practice affecting a definable class in common ways." 628 F.2d at 277. According to UPS, consideration of the *Stastny* factors makes clear that the "individualized and localized nature of the employment decisions at issue" defeat commonality. Opp. Mem., p. 21. Although the Court has no particular fondness for multi-factor tests, it agrees that the *Stastny* factors are more illuminating than the mere assumption (in *Morgan*) that standardized personnel procedures are a sufficiently unifying factor for purposes of Rule 23(a)(2) & (3).

The plaintiffs in *Stastny* sought certification of a state-wide class of workers, relying, in part, on statistical evidence. The Court of Appeals, reversing the trial court on the certification issue, discussed the commonality criteria within the context of Title VII and specifically the two substantive theories of discrimination available to plaintiffs in such cases: disparate treatment and disparate impact. The Court noted:

> Central to both theories of liability where class-wide [race] discrimination is alleged is the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways. In disparate treatment theo-

ry, this is the 'pattern or practice,' followed as an employer's 'regular or standard operating procedure,' which so demonstrably treats [African–Americans] in relatively inferior ways that it justifies a rebuttable inference that it proceeds from an intention to treat them differently simply because of their race. In disparate impact theory, it is the practice or policy which, though demonstrably neutral or even benign in any [race]-related intent, nevertheless bears with disproportionately adverse impact and without any justification of business necessity upon [African–Americans].

It is in relation to the 'pattern or practice' element of both substantive theories that the commonality criteria for class action maintenance become most critical in Title VII litigation. Indeed, at this point the class action and merit inquiries essentially coincide.

628 F.2d at 273–74 (citations omitted). Thus, the specific *Stastny* factors are designed to illuminate whether there is "an identifiable pattern or practice affecting a definable class in common ways." *Id.* at 277. The factors are:

(1) the nature of the challenged employment practice (Is it one that peculiarly affects only one or a few employees, or is it genuinely one having a class-wide impact?);

(2) the uniformity or diversity of the defendant's employment practices;

(3) the uniformity or diversity of the proposed class;

(4) the "nature of the employer's management organization as it relates to the degree of centralization and uniformity of relevant employment and personnel policies and practices;" and

(5) the length of time covered by the allegations (*i.e.*, whether similar conditions prevailed throughout the asserted period).

628 F.2d at 277.

### Nature of Challenged Employment Practice

 The Court begins by considering the nature of the challenged employment "practice" in this case. Specifically, the Court asks whether in fairness "subjective decisionmaking" can be considered a factor that unites the entire proposed class. The footnote in *Falcon* that gave rise to cases like this one alluded to the possibility that "*entirely* subjective decisionmaking processes" might be a basis for liability, if they resulted in discrimination. 457 U.S. at 157 n. 15, 102 S.Ct. 2364 (emphasis added). "[W]here there are some objective factors," however, "even a generally subjective process will not satisfy Rule 23's commonality and typicality requirements." *Betts v. Sundstrand Corp.*, 1999 WL 436579, at *6, 1999 U.S.Dist.LEXIS 9743, at *20 (1999). The processes utilized by UPS for determining full-time supervisor compensation are by no means "entirely subjective."[2] In fact, the evaluation forms utilized by the company are quite detailed with respect to UPS's expectations. For example, the earliest and allegedly most "subjective" of these forms, the Management Development Performance Appraisal ("MDPA"), requires evaluation of the following personal qualities and skills:

Communications

People Relationships

Integrity

Organizational Commitment

Adaptability

Planning and Organization

Holds People Accountable

Develops People

Organizational Coordination

Coaching and Delegation

Class Cert.Mem., Appendix, Exhibit E. Significantly, each of the foregoing is followed by a brief explanatory paragraph to guide the evaluator. For example, under "Communications":

Keeps people, manager and other managers informed. Listens to others and understands what they are saying. Re-

---

**2.** "Subjective," in the sense relevant to the Court's inquiry, means "modified or affected by personal views, experience, or background."

*Merriam–Webster's Collegiate Dictionary* 1172 (10th ed.1993).

sponds to others sincerely and directly. Speaks in a manner which can be understood by everyone. Descriptions of events are factual and direct. Voice is clear and calm. Memos and reports are factual, to the point and easily understood. Grammar and spelling are correct. Sentences are concise, not rambling or flowery.

*Id.* The plaintiffs do not argue that the appraisal forms, or the criteria they list, are discriminatory. Instead, they argue that they are too subjective. As a practical matter, the Court wonders how much more "objective" a performance evaluation form can be, given that "subjective criteria necessarily and legitimately enter into personnel decisions involving supervisory positions." *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989). As the Eleventh Circuit recently observed:

> subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy.... Personal qualities ... factor heavily into employment decisions concerning supervisory or professional positions. Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.
>
> ...
>
> It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation.

*Denney v. City of Albany*, 247 F.3d 1172, 1185–86 (11th Cir.2001) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). In short, "an employer's reliance upon legitimate, job-related subjective considerations" should not raise a "red flag" because it does not "suggest[ ] *in its own right* an intent to facilitate discrimination." *Id.* (emphasis added); *see also Reap v. Continental Casualty Co.*, 199 F.R.D. 536, 544–45 (D.N.J.).

Although the Court is skeptical concerning the plaintiffs' unproven premise that UPS's performance ratings are "tainted by bias," the Court will concede, for the sake of argument, that *some* managers allow racial bias to affect their performance evaluations. Such discrimination, if it occurs, is one step removed from UPS's decision to allow consideration of subjective factors in the first instance. It is driven by the biases of individual managers. The decision to permit some consideration of subjective factors is not, *in and of itself,* a discriminatory practice that provides the unifying thread necessary for "commonality" to exist. *Lott v. Westinghouse Savannah River Co., Inc.,* 2000 U.S.Dist. LEXIS 8013, at *48 (D.S.C. May 26, 2000); *E.E.O.C. v. McDonnell,* 17 F.Supp.2d 1048, 1052 (E.D.Mo.1998) ("[A] decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by *some* managers in a discriminatory manner, is not tantamount to a systematic, company-wide policy of intentional discrimination"), *aff'd,* 191 F.3d 948 (8th Cir.1999); *Brooks v. Circuit City Stores,* 1996 WL 406684 at *4 (D.Md.1996) (subjective decisionmaking is not itself a practice that discriminates; rather, it allows a situation to exist in which some managers are able to discriminate intentionally); *De La Fuente v. Chicago Tribune Co.,* 1985 WL 2103, at *4 (N.D.Ill.) (plaintiff must prove more than existence of a "subjective procedure"; he must establish that the procedure discriminates against "a significant number of people"); *contra Morgan,* 169 F.R.D. at 356. If the decision to permit some measure of subjectivity could be regarded as itself a discriminatory practice, virtually all Title VII cases against large employers would be transformed into nationwide class action lawsuits. The class action device was never intended to have such broad application. Rather, it was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano,* 442 U.S. at 700–01, 99 S.Ct. 2545.

### Uniformity of Challenged Employment Practice

The second *Stastny* factor, uniformity of the defendant's employment practices, is also

critical. As the Court noted in a previous opinion, the "principal question, for certification purposes, is whether the plaintiffs can make an adequate statistical showing of a *consistent* pattern of [lower pay] within the class of African–American [full-time supervisors], both within their respective districts and nationally." Decision and Order, April 5, 2000, p. 3 (emphasis added). However, it is impossible to infer, from the statistical data adduced by the plaintiffs, that UPS managers uniformly or systematically evaluate African–American supervisors in a discriminatory fashion, if indeed they do so at all. The parties agree that there is a statistically significant gap in compensation between African–Americans and whites when the data are considered *in the aggregate.*[3] However, closer examination reveals differences that undermine commonality. For example, even the plaintiffs' expert admits that in a majority of the districts he could find no statistically significant difference in pay between African–American and white supervisors. Deposition of Mark E. Meitzen, Ph.D. ("Meitzen Dep."), p. 89; Ward Rept., p. 3. The only named plaintiffs to work in a district with a statistically significant differential work in the Sacramento district, where the difference apparently *favors* African–Americans. Opp.Mem., p. 12 n. 12 (interpreting Meitzen Dep., Exhibit 4). The lack of any *consistent* pattern belies the notion that class members have been affected in common ways by the supposed "practice" of "subjective decisionmaking." As UPS's expert explains:

> Were there a systematic bias in the pay of African–American supervisors we would expect the salary difference, even if it is small, to be found in most places we looked. [However,] *the nationwide average disguises enormous variety.* When pay is analyzed district by district and when all relevant factors are controlled,

there are almost as many districts of UPS in which African–American supervisors make *more* than white supervisors, as there are districts where they make less. In some of the districts, the advantage to African–Americans is statistically significant and in others the disadvantage is statistically significant, while in most of the districts the difference is insignificant— *exactly what would be expected if these differences were unsystematic and random.*

Ward Rept., p. 7 (emphasis added).

The plaintiffs' somewhat tendentious reliance on aggregate data illustrates the perils and misuses of statistical analysis. If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty. Likewise, focusing on the aggregate numbers with respect to supervisor pay at UPS masks differences from district to district and from supervisor to supervisor that preclude a finding of "commonality." In short, the numbers do not reveal a "pattern or practice" of discrimination (intentional or otherwise) that unites the class.

### Uniformity Over Time

A further "commonality" consideration, analyzed as the fifth factor in *Stastny,* is the degree (or lack) of uniformity *over time.* Apparently, the experts have not analyzed the data with a view toward detecting temporal variations. However, the plaintiffs argue that the performance evaluation criteria employed by UPS became *less* subjective as the years went by. Class Cert.Mem., pp. 4–5. Thus, even if one accepts the premise that partially "subjective decisionmaking" is itself a discriminatory practice, the plaintiffs admit

---

**3.** UPS's expert concedes this point. Ward Rept., pp. 2, 13. However, he argues that when the data are controlled for relevant, non-racial factors, such as education and employment history, there is *no* statistically significant difference. One of the "controls" used by Dr. Ward is for "performance ratings." The plaintiffs dispute the validity of controlling for performance ratings. This, after all, is precisely where they

allege that subjectivity gives way to discrimination. Dr. Ward counters with the persuasive observation that he could find no statistically significant differences with respect to any *other* discretionary personnel decisions that are based on the *same* ratings (*e.g.,* promotion decisions). *Id.,* pp. 2–3. This finding, the Court agrees, undermines the plaintiffs' assumption that performance ratings are "tainted" by bias.

that not all class members have been "subjected" to the same degree of subjectivity.

### Diversity of Proposed Class

The proposed class *itself* also lacks uniformity. "To establish commonality in the context of race discrimination, the plaintiffs must allege a 'nexus' or a 'unifying force' other than race between class representatives and the proposed members of the class." *Harris v. City of Chicago*, 1998 WL 59873, *5 (N.D.Ill.) (quotation omitted). Discrimination "based solely on the class members' membership in a particular group and which manifests itself in a different set of facts for each employee is not enough to satisfy the commonality requirement." *Id.* (citing *Patterson v. General Motors*, 631 F.2d 476, 481 (7th Cir.1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981)). True enough, all of the class members are full-time supervisors, and African–American, but it turns out that there are some 425 different types of full-time supervisor within the UPS organization. Soupata Decl., ¶ 12. As UPS observes in its brief:

> One full-time supervisor may supervise the operation of tractors, another works in an office and is responsible for the collection of accounts receivables from large local customers, another supervises Union employees as they load trucks with packages for delivery while yet another engages in direct sales in the field. The training, prior experience and educational background recommended for these diverse positions vary as well. Furthermore, they live in different geographic locations throughout the country and are assigned to different salary grades with different salary ranges.

Opp.Mem., p. 26. The Court agrees with UPS that such diversity of class membership "weighs heavily against certification," especially when the only non-racial factor uniting the class is the elusive "practice" of "subjective decisionmaking." [4]

### Decentralization

Lastly, the Court considers the decentralized nature of UPS's decisionmaking relative to supervisor pay. When blame for discrimination is laid at the feet of a single decisionmaker, or a small group of individuals, it is comparatively easy to find "commonality." *See, e.g., Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir.1986) (finding commonality because "decisions affecting employees' opportunities for transfer, training and promotion were made by the same, central group of people."). Here, by contrast, the decisions of apparently hundreds of center managers are implicated, requiring many individualized inquiries that not only undermine "commonality" but also have the potential to render class treatment unworkable. *See* Rule 23(b)(3)(D). The Court indicated in a prior opinion that lack of centralized control, while an important factor, would not by itself defeat class certification. Decision and Order, April 5, 2000, p. 3. However, it is undisputed that decisions about pay were made at the local (*i.e.*, no higher than the district) level. In combination with the factors discussed above, especially the lack of a *consistent* pattern of lower pay for African–Americans, [5] the Court believes that UPS's decentralized decisionmaking argues against a finding of commonality or typicality.

The Court is not alone in giving considerable weight to the decentralized nature of the defendant's decisionmaking. Indeed, in *Stastny*, Judge Phillips noted that "[t]he crucial deficiencies in the record that undercut the district court's certification of a statewide class trace essentially to an apparent failure to appreciate the significance of the dispersion of [the defendant's] work force hence of the putative class members throughout a great number of geographically separated facilities . . . ." 268 F.2d at 278; *see also Reap*,

---

4. Likewise, the class of persons allegedly engaged in discrimination (center managers) is not uniform. A significant number of African–Americans were promoted to managerial positions from 1993 to 1998. Indeed, three of the named plaintiffs now hold this position. The significance of this for the "adequacy of representa-

tion" prerequisite of Rule 23(a)(4) is discussed below.

5. As noted above, UPS's policy of decentralized, discretionary decisionmaking has not, in the majority of districts, led to a *statistically significant* pay disparity.

199 F.R.D. at 544–45 ("policy" of delegating discretionary employment decisions to local level is not ordinarily a basis for class certification); *Lott*, 2000 U.S.Dist. LEXIS 8013, at \*\*54–56; *Betts*, 1999 WL 436579, at \*5, 1999 U.S.Dist. LEXIS 9743, at \*19; *Zachery v. Texaco*, 185 F.R.D. 230, 238–40 (W.D.Tex. 1999); *Jefferson v. Ingersoll*, 1999 WL 669229 (N.D.Ill.1999) (lack of centralized decisionmaking with respect to salary determinations defeats commonality even though company has standardized guidelines and policies), *rev'd in part on other grounds*, 195 F.3d 894 (7th Cir.1999); *Abrams v. Kelsey–Seybold Med. Group, Inc.*, 178 F.R.D. 116, 130 (S.D.Tex.1997) (commonality and typicality lacking because "the members of the purported class were not subjected to the same decisionmaking authority."); *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 159 (D.Kan.1996) (absence of centralized employment decisionmaking or a showing of decentralization by the defendant may result in denial of class certification) (citing 5 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 24.21, at 24–95 (3rd ed.1992)); *Gorence v. Eagle Food Ctrs., Inc.*, 1994 U.S.Dist. LEXIS 11438, \*\*26–27, 1994 WL 445149, \*9 (Aug. 15, 1994).

To summarize, the Court does not agree with the analysis in *Morgan*, which begins and ends by asking whether the employer utilizes standardized personnel procedures that are claimed to be "excessively subjective." The approach in *Morgan* would subject to class action treatment virtually all large employers whose standardized personnel procedures incorporate some elements of subjectivity. The class certification question clearly requires a more "rigorous analysis." *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364. After careful consideration of the statistical data, affidavits and expert reports in light of the factors outlined in *Stastny*, the Court can find no "identifiable [discriminatory] pattern or practice" that "affect[s] a definable class in common ways." 628 F.2d at 277. Instead, the Court is left with the impression of a large group of diverse (and diversely-treated) supervisors whose highly individualized claims of discrimination do not lend themselves to class-wide proof. In short, the plaintiffs have failed to establish the prerequisites of commonality and typicality under

Rule 23(a)(2) & (3) and may not proceed, on a class-wide basis, with either a disparate impact or a disparate treatment theory of race-based pay discrimination.

### C. *Adequacy of Named Plaintiffs as Class Representatives*

■ "Rule 23(a)(4) requires that the named plaintiffs adequately and fairly represent the interests of the class as a whole." *Allen*, 828 F.Supp. at 553. "The determination of whether the representative parties will fairly and adequately protect the interests of the class entails a two-fold inquiry. First, the court must be satisfied that the named plaintiffs' counsel is qualified to sufficiently pursue the putative class action. Second, the members of the advanced class may not have antagonistic or conflicting interests." *Id.* While the Court has no reason to doubt the qualifications of plaintiffs' counsel, or their ability to commit the necessary resources to class action litigation, the Court is concerned that the interests of the class members diverge in various ways from those of the putative class. Some of the ways in which the named plaintiffs' claims are uncommon and atypical have been discussed above. *See Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364 (commonality and typicality requirements "also tend to merge with the adequacy-of-representation requirement"). In a nutshell, the named plaintiffs are inadequate class representatives because the statistics fail to show that they " 'possess the same interest and suffer the same injury as the class members.' " *West*, 96 F.R.D. at 553 (quoting *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)). Not one of the ten named plaintiffs works in a district with a statistically significant pay disparity. Ward Rept., Table 12; Meitzen Dep., Exhibit 4. Indeed, not even Steve Jamison, the sole named plaintiff who can *himself* claim a statistically significant shortfall, works in such a district. Ward Rept., Table 11. Many members of the proposed class have been promoted to center manager. This includes three of the named plaintiffs, who now have an interest in demonstrating that they, at least, do *not* discriminate under UPS's decentralized,

partially subjective system. Soupata Decl., ¶ 11; Declaration of Linda R. Adam ("Adam Decl."), ¶ 4; Gray Decl., ¶ 4. In various ways, then, it appears that the interests of the named plaintiffs and those of the proposed class do not coincide. Thus, no matter how dedicated their counsel, the Court concludes that they will not fairly and adequately represent absent class members.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion for class certification is DENIED;

2. Defendants' motion for leave to file memorandum in sur-reply to plaintiffs' motion for class certification is GRANTED; and

3. Defendants' (unopposed) motion for leave to file declaration of Lea Soupata under seal is GRANTED. This opinion, which refers to portions of the Soupata declaration, shall be sealed temporarily, pending input from UPS concerning whether it is necessary to redact any of the references to the Soupata declaration prior to unsealing the opinion and releasing the same for publication.

SO ORDERED.